UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEDIVAS, LLC, a California limited liability company, et. al.<br><br>Plaintiffs,<br>v.<br><br>MARUBENI CORP., and DOES 1 through 100,<br><br>Defendants. | CASE NO. 10-CV-1001 W (BLM)<br><br>**ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION [DOC. 5], (2) DENYING PLAINTIFFS' MOTION TO REMAND [DOC. 7], AND (3) GRANTING EX PARTE APPLICATION TO SUPPLEMENT THE RECORD [DOC. 19]** |

   Pending before this Court is Defendant Marubeni Corporation's motion to compel arbitration [Doc. 5], Plaintiffs' motion to remand [Doc. 7], and Plaintiffs' ex parte application to supplement the record [Doc. 19]. The motions are opposed.

   The Court decides the matters on the papers submitted and without oral argument pursuant to Civil Local Rule 7.1(d.1). The Court **GRANTS** the ex parte application to supplement the record [Doc. 19]. Additionally, for the reasons stated below, **GRANTS IN PART** and **DENIES IN PART** the motion to compel arbitration [Doc. 5], and **DENIES** the motion to remand [Doc. 7].

## I. BACKGROUND

Marubeni is a Japanese multinational corporation. Plaintiff MediVas is a biomedical company. Plaintiffs Kenneth W. Carpenter, Joseph D. Dowling, William G. Turnell, Sachio Okamura, T. Knox Bell, Dari Darabbeigi, Lindy Hartig, William Summer, and Paul Teirstein (collectively, the "Individual Plaintiffs") are managers, employees, and investors of MediVas.

On April 13, 2004, MediVas and Marubeni entered into an unsecured Convertible Note Purchase Agreement (the "Note Purchase Agreement"). (*See Pls.' Notice of Lodging in Support of Remand Mot.* ("Pls.' NOL") Ex. 1 [Doc. 7-4].) The agreement obligated Marubeni to make advances to MediVas in an aggregate principal amount not to exceed $5 million. In exchange, MediVas was obligated to make quarterly interest payments, and to pay the principal on the note's maturity date. The Note Purchase Agreement also included an arbitration provision providing that "[a]ll disputes and differences which may arise out of or in connection with this Agreement, or the breach thereof . . . shall be submitted to arbitration under the commercial arbitration rules of the International Chamber of Commerce (the "ICC") for final and binding arbitration." (*Id.*, ¶ 10.14.)

In addition to the Note Purchase Agreement, the parties entered into an Agency Agreement, whereby MediVas appointed Marubeni as its exclusive agent in Japan. (*See Pls.' NOL*, Ex. 2.) The Agency Agreement also contains an arbitration provision. (*Id.*, ¶ 9.2.)

By June 2004, MediVas borrowed the entire $5 million from Marubeni. From April 2004 to June 2007, MediVas made all quarterly interest payments. However, at some point in 2007, MediVas began experiencing cash flow shortages and liquidity problems. By July 2007, when the principal obligation on the Note Purchase Agreement became due, MediVas' could not afford to pay its daily operating expenses and obligations under the note. MediVas informed Marubeni of its inability to retire the debt.

Meanwhile, as a way to deal with its financial hardship, MediVas began merger discussions with Nastech Pharmaceutical Company, Inc. By September 2007, MediVas and Nastech drafted an Agreement and Plan of Merger. In order to complete the merger, Nastech requested that MediVas' lenders consent to the merger. Marubeni refused and threatened to pursue legal action under the Note Purchase Agreement. Eventually, in order to obtain Marubeni's consent, MediVas agreed to enter into three additional contracts: a Forbearance Agreement, Security Agreement, and Intellectual Property Security Agreement ("IP Security Agreement").

On October 10, 2007, MediVas and Marubeni signed the Forbearance Agreement, whereby Marubeni agreed not to exercise any remedies available under the Note Purchase Agreement and promissory note.[1] (*See Pls.' NOL*, Ex. 3 at ¶ 2.) In exchange, MediVas' agreed to limit its ability to issue equity (*id.* at ¶ 7), and "to grant [Marubeni] a first priority security interest in all of [MediVas'] assets" (*id.* at ¶ 4).

The Security Agreement granted Marubeni "a continuing security interest in and to all right, title, and interest" in MediVas' collateral.[2] (*Pls.' NOL*, Ex. 4 at ¶ 2.1.) Unlike the 2004 agreements, the Security Agreement does not contain an arbitration provision, and instead includes a venue clause providing that state and federal courts in San Diego "will have exclusive jurisdiction to hear and determine any dispute, claim or controversy between or among them concerning the interpretation or enforcement of this Agreement." (*Id.* at ¶ 6.14.)

---

[1] MediVas provided Marubeni a promissory note reflecting the $5 million in advances.

[2] MediVas utilizes the functional equivalent of a stock program to attract and retain key personnel. Individual Plaintiffs executed a series of promissory notes ("Incentive Notes") for the purchase of "stock" units. According to MediVas and Individual Plaintiffs, the Incentive Notes were not to be enforced absent a liquidity event. MediVas allegedly defaulted on the Forbearance Agreement. As a result, Marubeni exercised its right to foreclose on the Incentive Notes. MediVas alleges that Marubeni conducted a sale of the Incentive Notes, and acquired title to them at .001 of the face amount. The parties dispute whether the Incentive Notes are considered "collateral" under the Security Agreement.

1  The IP Security Agreement granted Marubeni a security interest in all of its "intellectual property, copyrights, patents, patent applications, trademark, know-how, trade secrets, and related goodwill." (*Pl.'s NOL*, Ex. 5 at p. 1.) This agreement does not contain an arbitration or venue clause.

Despite executing these contracts, the Nastech merger failed. MediVas alleges the failure was caused by Marubeni's refusal to timely consent to the merger.

In March 2008, MediVas entered into discussions with DSM Biomedical Materials B.V. ("DSM"). By September 2008, DSM had engaged MediVas in discussions for the acquisition of MediVas for a purchase price of between $100-$130 million. MediVas alleges that the Forbearance Agreement, Security Agreement and IP Security Agreement caused the negotiations to degrade into discussions about a license agreement. DSM determined that "MediVas had no options and reduced the license agreement from $16 million to $8 million." (*Compl.*, ¶ 72.) Of the $8 million MediVas was going to receive, MediVas agreed to pay $1 million to Marubeni. Nevertheless, Marubeni refused to consent to the agreement and insisted that DSM pay sufficient funds from the license to Marubeni to completely repay their loan and accrued interest. DSM refused.

On February 11, 2009, MediVas and DSM executed a technology license agreement. Instead of paying MediVas $8 million, DSM reduced the price to $7 million.

On April 28, 2010, MediVas filed this action in the San Diego County Superior Court. On May 10, 2010, Marubeni removed the lawsuit to this Court. MediVas now seeks to remand the case to state court. Marubeni seeks to compel arbitration and stay the litigation.

//
//
//

**II.  MOTION TO REMAND**

**A.     Standard**

In a removal action, the district court must remand a case to state court if, at any time before final judgment, the court determines that it lacks subject matter jurisdiction or when the notice of removal contains plain jurisdictional defects. See 28 U.S.C. § 1447 *et seq*. The party seeking to invoke removal jurisdiction bears the burden of supporting its jurisdictional allegations with competent proof. Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th Cir. 1992) (per curiam); Emrich v. Touche Ross & Co., 846 F.2d 1190, 1195 (9th Cir. 1988). "The propriety of removal thus depends on whether the case originally could have been filed in federal court." Chicago v. International College of Surgeons, 522 U.S. 156, 163 (1997).

The Court's removal jurisdiction must be analyzed on the basis of the pleadings at the time of removal. See Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, 159 F.3d 1209, 1213 (9th Cir. 1998). "As a general rule, absent diversity jurisdiction, a case will not be removable if the complaint does not affirmatively allege a federal claim." Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 123 S. Ct. 2058, 2062 (2003). District courts must construe the removal statutes strictly *against* removal and resolve any uncertainty as to removability in favor of remanding the case to state court. Gaus, 982 F.2d at 566.

**B.     Discussion**

Relying on the arbitration provision in the 2004 Note Purchase Agreement, Marubeni removed this case under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), 9 U.S.C. §§ 203–205. MediVas argues that jurisdiction does not exists under the Convention because the parties amended and rescinded the 2004 agreements when they entered into the 2007 agreements. Because the 2007 agreements did not supersede the Note Purchase Agreement or arbitration provision, the Court finds the removal was proper.

### 1. **The Security Agreement does not supersede or amend the Note Purchase Agreement's arbitration clause.**

According to MediVas, there "is no longer any contractual basis for the arbitration demand" because "[t]he 2007 Security Agreement amended and superseded the 2004 Note Purchase Agreement . . . ." (*Remand Mot.*, 15:2–4 [Doc. 7].) But MediVas has failed to cite any provision or language in the Security Agreement (or any other agreement) stating that the Note Purchase Agreement is superseded. Nor has MediVas cited any provision or language superseding or amending the arbitration clause.

MediVas nevertheless argues that the Security Agreement's venue provision amended and superseded the arbitration clause. (*Pls.' Remand Reply*, 2:18–20 [Doc. 11].) This argument is not persuasive for at least two reasons. First, the Note Purchase Agreement specifically provides that it "may be amended or supplemented only by a writing that refers explicitly to this Agreement, . . . and expressly states that it is an amendment to the terms hereof." (*Pls.' NOL*, Ex. 1, § 10.1.) The Security Agreement's venue provision does not refer to or state that it is amending or supplementing either the Note Purchase Agreement or the arbitration clause.

Second, the venue provision is expressly limited to "any dispute, claim or controversy between or among [the parties] concerning the interpretation or enforcement of this Agreement, or any other matter arising out of or relating to this Agreement." (*Plt's NOL*, Ex. 4 at ¶ 6.14.) The Security Agreement defines the term "Agreement" to mean "this Security Agreement, as amended from time to time." (*Id.*, ¶ 1.3) The venue provision, therefore, applies to disputes regarding the interpretation or enforcement of the Security Agreement, while the arbitration provision applies to disputes that may "arise out of or in connection with" the Note Purchase Agreement. (*See Id.*, Ex. 1 at ¶ 10.14.) Because the two provisions do not conflict, MediVas suggestion that the venue provision impliedly supersedes the arbitration provision lacks merit.

### 2. The Forbearance Agreement contradicts MediVas' argument that the arbitration clause is superseded.

The Forbearance Agreement also contradicts MediVas argument that the Note Purchase Agreement and/or the arbitration clause have been superseded.

As described above, the parties entered the Forbearance Agreement because MediVas defaulted under the Note Purchase Agreement and promissory note (which are referred to collectively as the "Loan Documents" in the Forbearance Agreement). (*Plt's NOL*, Ex. 3 at ¶¶ A, C.) MediVas, therefore, requested "Marubeni to forbear from exercising any remedies available under the Loan Documents" and Marubeni agreed, subject to MediVas "performance . . . of all terms of" the Forbearance Agreement. (*Id.*, ¶¶ C & 1.) In agreeing to forbear, however, Marubeni did not waive any future defaults by MediVas under the Loan Documents. (*Id.*, ¶ 2.) MediVas' continued obligation to comply with the Loan Documents means that the Forbearance Agreement could not have superseded the Note Purchase Agreement.

Moreover, as stated above, the Note Purchase Agreement specifically provides that it "may be amended or supplemented only by a writing that refers explicitly to this Agreement, . . . and expressly states that it is an amendment to the terms hereof." (*Plt's NOL*, Ex. 1 at ¶ 10.1.) Consistent with this provision, paragraph 7 of the Forbearance Agreement—entitled "Amendment of Note Purchase Agreement"— identifies only one paragraph in the Note Purchase Agreement that the parties modified: "Paragraph 8.1(a) of the Note Purchase Agreement is amended to read. . . ."[3] (*Pls.' NOL*, Ex. 3 at ¶ 7.) This provision confirms that the parties did not intend to amend the remaining provisions of the Note Purchase Agreement.

Finally, the Forbearance Agreement also includes a provision entitled "Entire Agreement," which provides:

> This Agreement, the Security Document and *the Loan Documents* contain

---

[3]Paragraph 8.1(a) of the Note Purchase Agreement pertains to the issuance of equity.

- 7 - 10cv1001w

> the entire agreement of the parties hereto and supersede any other oral or written agreements or understandings.

(*Plt's NOL*, Ex. 3 at ¶ 11.b (emphasis added).)  This provision further clarifies that the parties remain bound by the unamended provisions of the Note Purchase Agreement, which includes the arbitration clause.  Viewed another way, if the Note Purchase Agreement was indeed superseded, it would no longer be part of "the entire agreement of the parties. . . ."

For these reasons, this Court has jurisdiction under the Convention.

### III.  MOTION TO COMPEL ARBITRATION

#### A.  Standard

The Convention is incorporated in chapter two of the Federal Arbitration Act ("FAA"). 9 U.S.C. §§ 201-08.  Under the Convention, federal district courts have original jurisdiction over "action[s] or proceeding[s] falling under" the Convention regardless of the amount in controversy. Id. at § 203.  Section 202 provides that, "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial . . . falls under the Convention." Id. at § 202.

The Ninth Circuit has determined that district courts must compel arbitration pursuant to the Convention, generally speaking, if four jurisdictional prerequisites are satisfied:

> (1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

Balen v. Holland Am. Line Inc., 583 F.3d 647, 654 (9th Cir. 2009) (quoting Bautista v. Star Cruises, 396 F.3d 1289, 1294 n.7 (11th Cir. 2005)); see also Rogers v. Royal Caribbean Cruise Line, 547 F.3d 1148, 1157 (9th Cir. 2008) ("[T]he Convention

*compels* federal courts to direct *qualifying* disputes to arbitration . . . .") (second emphasis added). If certain claims fall within the scope of an arbitration agreement, then the arbitration agreement must be enforced notwithstanding such a "piecemeal resolution" of a particular dispute. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 20 (1983) ("[R]elevant federal law *requires* piecemeal resolution when necessary to give effect to an arbitration agreement.") (emphasis in original).

The Convention includes a general provision incorporating the FAA. See 9 U.S.C. § 208 ("Chapter 1 [the FAA] applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States."). The FAA governs disputes involving contracts which touch upon interstate commerce or maritime law. 9 U.S.C. §§ 1 *et seq*. The FAA preempts state law where the validity of an arbitration clause is disputed. See Moses H. Cone Mem'l Hosp., 460 U.S. at 24. The district court can only determine whether an agreement to arbitrate exists, and if so, to enforce it in accordance with its terms. Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 720 (9th Cir. 1999) (citing Howard Elec. & Mech. v. Briscoe Co., 754 F.2d 847, 849 (9th Cir. 1985)). Additionally, once an agreement to arbitrate is found to exist, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Id. at 719 (citing Moses H. Cone Mem'l Hosp., 460 U.S. at 24).

The Supreme Court held "[the FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25; Quakenbush v. Allstate Ins. Co., 121 F.3d 1372, 1380 (9th Cir. 1997). Enforcement of an arbitration agreement "should not be denied unless it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." AT&T Technologies, Inc. v. Communication Workers, 475 U.S. 643, 650 (1986); see also United Food and Comm.

Workers Union v. Geldin Meat Co., 13 F.3d 1365, 1368 (9th Cir. 1993) ("Doubts should be resolved in favor of coverage.").

### B.     Discussion

Marubeni seeks to compel arbitration of MediVas' claims and the Individual Plaintiffs' claims. For the reasons stated below, the Court finds only MediVas' claims must be arbitrated.

#### 1.     MediVas must arbitrate its claims.

Marubeni argues that all of Plaintiffs' claims, including the tort-based causes of action, touch upon matters covered by the Note Purchase Agreement. Because the agreement indisputably includes an arbitration provision, Marubeni argues the case must be arbitrated.

MediVas does not dispute that all of the claims have the same factual genesis. (*Arb. Opp'n*, 12:3–6 [Doc. 10].) Instead, Plaintiffs argue that arbitration provision was replaced by the Security Agreement's venue provision. (*Id.* at 10:5–8.)

As stated above, the only provision in the Note Purchase Agreement that was amended by the 2007 agreements was paragraph 8.1(a), dealing with the issuance of equity. (*See Pls.' NOL*, Ex. 3 at ¶ 7.) There are no other provisions in the Forbearance Agreement, the Security Agreement or the IP Security Agreement that amend or supersede the Note Purchase Agreement or the arbitration clause. Because MediVas concedes that all of its claims are related to the 2004 Note Purchase Agreement, MediVas must arbitrate its claims.

#### 2.     The Individual Plaintiffs cannot be compelled to arbitrate.

The Individual Plaintiffs are not parties to the Note Purchase Agreement, and Marubeni can point to no agreement with the Individual Plaintiffs that includes an

arbitration provision. Marubeni nevertheless argues that the Individual Plaintiffs should be compelled to arbitrate their claims under the doctrine of equitable estoppel.

According to Marubeni, "a nonsignatory is estopped from refusing to comply with an arbitration clause when it receives a direct benefit from a contract containing an arbitration clause and/or it relies on the terms of the written agreement in asserting its claims against the signatory." (*Mt. Compel Arb.*, 13:7–10.) In support of this position, Marubeni relies on the unpublished district court opinion in <u>Omni Home Financing, Inc. v. Hartford Life & Annuity Ins. Co., Benefit Systems, Inc.</u>, 2006 U.S. Dist. LEXIS 81767 (S.D. Cal 2006).

But as Plaintiffs point out, <u>Omni Home</u> is easily distinguishable from the present case because in <u>Omni Home</u>, the purpose of the agreement containing the arbitration clause was to provide services for the plaintiffs, and the lawsuit arose out of the agreement. <u>Id.</u> at * 16. In contrast, here, the purpose of the Note Purchase Agreement was for Marubeni to lend money to MediVas. The agreement was not entered in order to provide services or any other direct benefit to the Individual Plaintiffs. Additionally, the Individual Plaintiffs' claims arise from a dispute about the impact of the 2007 Security Agreement—not the Note Purchase Agreement—on the Individual Plaintiffs' Incentive Notes. (*See Compl.*, ¶ 59.) For these reasons, the Court finds the Individual Plaintiffs are not subject to the arbitration agreement.

IV. **CONCLUSION & ORDER**

The Court **GRANTS** Plaintiffs' ex parte application to supplement the record.[4] Additionally, for the reasons stated above, the Court **DENIES** Plaintiffs' motion to remand the entire case, and **GRANTS** Defendant's motion to compel arbitration as to MediVas, but **DENIES** the motion as to the Individual Plaintiffs.

---

[4]Although the Court grants the ex parte application, the information provided therein was of little assistance in resolving the pending motions given that, as Plaintiffs concede, resolution of the motions turned on whether the Note Purchase Agreement's arbitration clause was superseded by the 2007 agreements. (*See Schreiner Dec.*, at f.n. 3 [Doc. 19-1].)

Because neither party addressed how the Individual Plaintiffs' claims should proceed in the event only MediVas was ordered to arbitration, the Court also **ORDERS** as follows:

- On or before **March 14, 2011**, the parties must submit a brief, not to exceed 10 pages, addressing whether the Individual Plaintiffs' claims should be stayed or remanded to state court.

**IT IS SO ORDERED.**

DATED: February 28, 2011

Hon. Thomas J. Whelan
United States District Judge