1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10
11
12

MEDIVAS, LLC, a California limited
liability company, et. al.

13

Plaintiffs,

14

v.

15
16

MARUBENI CORP., and DOES 1
through 100,

17
18

Defendants.

CASE NO. 10-CV-1001 W (RBB)
(Consolidated w/ Case No. 11CV2852)

**ORDER (1) GRANTING
PETITION TO CONFIRM
ARBITRATION AWARDS AND
(2) DENYING CROSS PETITION
TO VACATE AWARDS**

19
20
21
22
23
24

Pending before the Court is Defendant Marubeni Corporation's petition to confirm the arbitration awards, and Plaintiff MediVas, LLC's cross-petition to vacate the awards. The Court decides the matters on the papers submitted and without oral argument pursuant to Civil Local Rule 7.1(d.1). For the reasons stated below, the Court **GRANTS** Marubeni's petition to confirm and **DENIES** MediVas' cross-petition to vacate.[1]

25
26
27
28

---

[1] The petition and cross petition were filed in Case No. 11cv2852. However, because the orders compelling arbitration were entered in this case, on March 10, 2014 this Court ordered the two cases consolidated, with this case to serve as the lead case. (*See Consolidation Order* [Doc. 59], 3:3–8.) The parties then filed their supporting and opposing memorandum of points and authorities in this case.

I.      BACKGROUND

    A.      Factual history.

        The following factual history is taken from the February 28, 2011 order granting in part and denying in part Defendant Marubeni's motion to compel arbitration, and denying Plaintiffs' motion to remand (the "Arbitration Order" [Doc. 23]).

        Defendant Marubeni is a Japanese multinational corporation.  Plaintiff MediVas is a biomedical company.  Plaintiffs Kenneth W. Carpenter, Joseph D. Dowling, William G. Turnell, Sachio Okamura, T. Knox Bell, Dari Darabbeigi, Lindy Hartig, William Summer, and Paul Teirstein (collectively, the "Individual Plaintiffs") are managers, employees, and investors of MediVas.[2]

        On April 13, 2004, MediVas and Marubeni entered into an unsecured Convertible Note Purchase Agreement (the "Note Purchase Agreement"), whereby Marubeni agreed to make advances to MediVas of up to $5 million.  In exchange, MediVas agreed to make quarterly interest payments, and to pay the principal on the note's maturity date.  The agreement contains an arbitration provision providing:

> All disputes and differences which may arise out of or in connection with this Agreement, or the breach thereof . . . shall be submitted to arbitration under the commercial arbitration rules of the International Chamber of Commerce (the "ICC") for final and binding arbitration.

(*Note Purchase Agreement* [Doc. 67-2], ¶ 10.14.[3])  In addition to the Note Purchase Agreement, the parties entered into an Agency Agreement, whereby MediVas appointed Marubeni as its exclusive agent in Japan.  The Agency Agreement also contains an arbitration provision.  (*See Agency Agreement* [Doc. 67-3], ¶ 9.2)

        By June 2004, MediVas borrowed the entire $5 million from Marubeni.  From April 2004 to June 2007, MediVas made all quarterly interest payments.  However, at

---

[2] On August 2, 2011, the Individual Plaintiffs' claims were remanded to the San Diego Superior Court. (*See Supplemental Arbitration Order* [Doc. 37], 13:13–17.)

[3] The Note Purchase Agreement and Agency Agreement are attached as Exhibits B and C, respectively, to Marubeni's points and authorities in support of the petition [Doc 67].

some point in 2007, MediVas began experiencing cash flow shortages and liquidity problems. By July 2007, when the principal became due, MediVas could no longer pay its daily operating expenses.

As a way to deal with its financial hardship, MediVas began merger discussions with Nastech Pharmaceutical Company, Inc. By September 2007, MediVas and Nastech drafted an Agreement and Plan of Merger, but Nastech requested the consent of MediVas' lenders. Marubeni refused and threatened to pursue legal action. In order to obtain Marubeni's consent, on October 10, 2007, MediVas and Marubeni entered into three additional contracts: a Forbearance Agreement, a Security Agreement, and an Intellectual Property Security Agreement ("IP Security Agreement").[4]

Under the Forbearance Agreement, Marubeni agreed not to exercise any remedies available under the Note Purchase Agreement and promissory note as a result of MediVas' failure to pay the outstanding principal. (*Forbearance Agree.*, ¶ 1.) However, the agreement specified that "[s]uch forbearance does not apply to any other Event of Default . . . or other failure by Borrower to perform in accordance with the Loan Documents and the Security Documents . . . ." (*Id.*, ¶ 2.[5])

In exchange for Marubeni's agreement to forbear from exercising its remedies, MediVas agreed to limit its ability to issue equity, and granted Marubeni "a first priority security interest in all of [MediVas'] assets." (*Forbearance Agree.*, ¶ 4.) The Security Agreement, therefore, grants Marubeni "a continuing security interest in and to all right, title, and interest" in MediVas' collateral. (*Security Agree.*, ¶ 2.1.) The IP Security Agreement grants Marubeni a security interest in all of its "intellectual property, copyrights, patents, patent applications, trademark, know-how, trade secrets, and related goodwill." (*IP Security Agree.*, p.1)

---

[4] The Forbearance Agreement, Security Agreement and IP Security Agreement were attached to MediVas' motion to remand as Exhibits 3, 4 and 5, respectively. (*See Pls.' Notice of Lodgement in Support of Remand Mt.* [Doc. 7-4].)

[5] "Loan Documents" means the Note Purchase Agreement and the Note. (*See Forbearance Agree.*, ¶ A.)

Unlike the 2004 agreements, none of the 2007 agreements include an arbitration provision. However, the Security Agreement contains a "Venue and Jurisdiction" clause (hereinafter, "venue provision") providing, in relevant part:

> Venue and Jurisdiction. Grantor and Lender agree that the state and federal courts located in San Diego, California (the "San Diego Courts"), will have exclusive jurisdiction to hear and determine any dispute, claim or controversy between or among them concerning the interpretation or enforcement of this Agreement, or any other matter arising out of or relating to this Agreement.

(*Security Agreement*, ¶ 6.14.) The term "Agreement" is defined under section 1.3 as "this Security Agreement, as amended from time to time." (*Id.*, ¶ 1.3.)

Despite executing the 2007 agreements, the Nastech merger failed. MediVas alleges the failure was caused by Marubeni's refusal to timely consent to the merger.

In March 2008, MediVas entered into discussions with DSM Biomedical Materials B.V. ("DSM") for the acquisition of MediVas for between $100-$130 million. MediVas alleges that the Forbearance Agreement, Security Agreement and IP Security Agreement caused the negotiations to degrade into discussions about a license agreement. MediVas also contends that Marubeni's refusal to consent to the license agreement, and its insistence on certain conditions, led DSM to reduce the license from $8 million to $7 million.

**B.    MediVas sues Marubeni.**

On April 28, 2010, MediVas filed this action in the San Diego County Superior Court. The Complaint alleges eight state-based causes of action for: (1) Avoidance of Illegal Contracts; (2) Breach of Contract - Note Purchase Agreement; (3) Breach of Contract - Agency Agreement; (4) Fraudulent Conveyance / Avoidable Transfer; (5) Intentional Interference with Prospective Economic Advantage - Nastech Merger; (6) Intentional Interference with Prospective Economic Advantage - DSM Acquisition; (7) Declaratory Relief - Note Purchase, Agency, Forbearance, and Security Agreements; and (8) Declaratory Relief - Incentive Notes.

1    On May 10, 2010, Marubeni removed the lawsuit to the United States District
2 Court for the Southern District of California.  Marubeni then filed a motion to compel
3 arbitration under the Convention on the Recognition and Enforcement of Foreign
4 Arbitral Awards (the "New York Convention"), 9 U.S.C. §§ 203–205, and to stay the
5 litigation.  MediVas filed a motion to remand.

6    In opposing Marubeni's motion, MediVas argued that the 2007 Security
7 Agreement's venue provision superseded the 2004 Note Purchase Agreement's
8 arbitration provision.  (*MediVas Opp. To Mt. To Compel Arb.* [Doc. 10], 10:5–8.)  And
9 because MediVas was convinced that the arbitration provision was superseded,
10 MediVas asserted that all of its causes of action had the same factual genesis, "whether
11 arising under the 2004 Agency Agreements or the 2007 Forbearance Agreements, and
12 whether sounding in contract or in tort. . . ." (*Id.*, 12:3–6.)

13    On or about June 1, 2010, the case was reassigned to this Court.  (*See Low
14 Number Rule Transfer Order* [Doc. 8].)  Then on February 28, 2011, this Court issued
15 an order granting Marubeni's motion to compel arbitration, and denying the motion to
16 remand as to MediVas.  (*See Arbitration Order*.)  In granting Marubeni's motion, the
17 order rejected MediVas' argument that the venue provision superseded and replaced
18 the arbitration provision.  (*Id.*, 6:1–8:6, 10:14–23.) And because MediVas asserted that
19 all of its causes of action were related and had the same factual genesis, the Court
20 ordered all of MediVas' claims to arbitration.  (*Id.*, 10:14–23.[6])

21    On March 22, 2011, Plaintiffs filed an ex parte application seeking leave to file
22 a motion for reconsideration.  The Court granted the application with respect to the
23 Arbitration Order's finding that all of MediVas' claims were subject to arbitration
24 because of the Ninth Circuit's decision in Polimaster LTD. v. RAE Systmes, Inc., 623
25 F.3d 832 (9th Cir. 2010), which was decided after the parties' motions were filed.  This
26 Court interpreted Polimaster as requiring an evaluation of whether each of MediVas'

27

28    [6]   The Arbitration Order also found that the Individual Plaintiffs were not bound by the arbitration agreement.  (*Arbitration Order*, 10:25–11:19.)

causes of action was subject to the arbitration provision.  However, the order informed the parties that the Court was not reconsidering its finding that the arbitration provision was valid and binding on the parties.  (*Order Granting Ex Parte* [Doc. 32], 3:8–13.)  On June 7, 2011, MediVas filed the motion for reconsideration.

On August 2, 2011, this Court issued an order compelling arbitration as to the majority of MediVas' claims, but denying arbitration as to the following:

(1) Avoidance of Illegal Contract (1st Cause of Action) with respect to the Forbearance Agreement, Intellectual Property Security Agreement, and Security Agreement;

(2) Declaratory Relief (7th Cause of Action) with respect to the Forbearance Agreement, Intellectual Property Security Agreement, and Security Agreement; and

(3) Declaratory Relief - Incentive notes (8th Cause of Action).

(*Supplemental Arbitration Order* [Doc. 37], 8:9–13:2, 14:7–16.)

On November 25, 2011, the Arbitral Tribunal issued a partial award on the merits in favor of Marubeni (the "Initial Award").  Then on January 27, 2012, the Arbitral Tribunal issued a Final Award after ruling on cost and fee issues.  Marubeni's petition to confirm, and MediVas' cross-petition to vacate followed.

## II.   STANDARD

The grounds for vacating an arbitration award under the New York Convention are set forth in Article V, 21 U.S.T. 2517.  See 9 U.S.C. § 207.  Under Article V, section 1, a court may refuse to confirm an award where the party against whom the award was made "furnishes . . . proof that:"

(a) The parties to the agreement . . . were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

(b) the party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or the arbitration proceedings or was otherwise unable to present his case; or

(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it

contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d)   The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e)   The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

21 U.S.T. 2517, Art. V, §§ 1(a)–(e).  Additionally, confirmation of an award may be refused where "recognition or enforcement of the award would be contrary to the public policy" of the country where confirmation is sought.  Id., Art. V, § 2(b).

"In a case governed by the Convention, 'the party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses under the New York Convention applies." Zeiler v. Deitsch, 500 F.3d 157, 164 (2d Cir. 2007) (citation omitted).  The "burden is substantial because the public policy in favor of international arbitration is strong, [citation omitted] and the New York Convention defenses are interpreted narrowly."  Polimaster, Ltd. v. RAE Systems, Inc., 623 F.3d 832, 836 (9th Cir. 2010); Zeiler, 500 F.3d at 836 (stating that the burden for opposing confirmation is a "heavy one, as the showing required to avoid summary confirmance is high.").  Accordingly, MediVas bears the substantial burden of establishing that one of the defenses set forth in Article V applies.

III.   DISCUSSION

MediVas argues that the awards should be vacated under each of the grounds listed in Article V, sections 1 and 2(b).  For the following reasons, the Court disagrees.

//

//

1      **A.**    <u>**MediVas' arguments premised on the theory that the Security**</u>
2      <u>**Agreement amended or voided the arbitration provision lack merit.**</u>

3      MediVas argues that the awards should be vacated because: (1) the awards deal
4 with disputes outside the terms of submission; (2) the subject matter is not capable of
5 settlement by arbitration under United States law; (3) the awards are invalid under
6 controlling federal and state law; (4) the arbitration was inconsistent with the parties'
7 agreement; and (5) recognition of the awards would be contrary to public policy.
8 (*MediVas Combined Opp. And P&A* [Doc. 70], 25:1–36:16.)  Although MediVas cites
9 five different grounds for vacating the award, each is based on the same underlying
10 premise: the 2007 Security Agreement's venue provision rescinded and replaced the
11 2004 Note Purchase Agreement's arbitration provision.  (*Id.*)  Because the Court
12 disagrees with MediVas' underlying premise, MediVas has failed to satisfy its burden of
13 demonstrating that any of the five stated grounds justify vacating the awards.

14      The terms of the 2004 and 2007 agreements establish that the venue provision
15 did not rescind or replace the arbitration provision.  As explained more fully in the
16 Arbitration Order, in entering into the 2004 Note Purchase Agreement, the parties set
17 forth requirements for amending its terms.  Paragraph 10.1 provides that the Note
18 Purchase Agreement "may be amended or supplemented only by a writing that refers
19 explicitly to this Agreement, . . . and expressly states that it is an amendment to the
20 terms hereof."  (*Note Purchase Agree.*, ¶ 10.1.)  Accordingly, in order to limit, rescind
21 or otherwise amend the agreement's arbitration provision, the 2007 Security Agreement
22 (or one of the other 2007 agreements) must contain language that refers to the
23 arbitration provision and "expressly states" that it is an amendment to that provision.
24 No such language exists in any of the 2007 agreements.

25      The absence of language in any of the 2007 agreements amending the arbitration
26 provision is also significant because the parties followed paragraph 10.1's requirement
27 in drafting the 2007 Forbearance Agreement.  Specifically, paragraph 7 of the
28

Forbearance Agreement, which is entitled "Amendment of Note Purchase Agreement," expressly states that it is amending paragraph 8.1(a) of the Note Purchase Agreement:

> Paragraph 8.1(a) of the Note Purchase Agreement is amended to read: [¶] "(a)  Issuance of Equity.  The Borrower shall not issue any equity of the Borrower or any other securities convertible into equity of the Borrower in excess of 20,000,000 Unite without the prior written consent of Lender.
> . . .

(*Forbearance Agree.*, ¶ 7.)  Thus, paragraph 7 confirms that where the parties sought to amend a provision in the 2004 agreement, the parties followed paragraph 10.1's requirement of explicitly referring to the Note Purchase Agreement and identifying the provision amended.

MediVas, nevertheless, argues that Applied Energetics, Incorporated v. Newoak Capital Markets, LLC, 645 F.3d 522 (2d Cir. 2011), "published mere days before this Court's August 2011 [Supplemental Arbitration] Order, is on all fours with this dispute" and establishes that the venue provision superseded the arbitration provision. (*MediVas Combined Opp. and P&A*, 25:17–18, 30:1–6.)  MediVas is wrong.

In Applied Energetics, the parties included an arbitration clause in an Engagement Agreement, which the Second Circuit described as a "preliminary letter agreement."  Id. 645 F.3d at 523.  The letter agreement "specifically contemplated that the parties would enter into a subsequent, more formal agreement setting forth 'the terms and conditions contained [in the Engagement Agreement] as well as those customarily contained in agreements of such character.'" Id. 645 F.3d at 523.

The parties' subsequent "more formal agreement," entitled Placement Agreement, "though embodying much of the substance of the Engagement Agreement, omitted any reference to arbitration.  Instead, the Placement Agreement expressly provided that the agreement would be governed by New York law" and that any dispute would be adjudicated in New York.  Id. 645 F.3d at 523.  Additionally, the Placement Agreement contained a merger clause stating that it, and certain other related documents (which did not include the Engagement Agreement) "constitute the entire

understanding and agreement between the parties" and that "there are no [other] agreements or understanding that apply."   Id. at 523–524.

When a subsequent dispute arose, one of the parties attempted to enforce the arbitration clause in the Engagement Agreement.   The Second Circuit found the arbitration clause was revoked by the forum-selection clause in the "more formal" Placement Agreement because the two clauses stood in direct conflict with each other:

> Here, the Placement Agreement's language that "[a]ny dispute" between the parties "shall be adjudicated" by specified courts stands in direct conflict with the Engagement Agreement's parallel language that "any dispute . . . shall be resolved through binding arbitration." Both provisions are all-inclusive, both are mandatory, and neither admits the possibility of the other.

Id. 645 F. 3d at 525.  In addition, the Second Circuit reasoned that the omission of the Engagement Agreement from the Placement Agreement's merger clause cleared "the path for the [forum-selection] clause to displace the Engagement Agreement's arbitration clause."   Id. at 526 n. 2.

Contrary to MediVas' argument, Applied Energetics is not "on all fours" with this case.  First, the arbitration provision at issue in Applied Energetics was included in the parties' "preliminary letter agreement" that "specifically contemplated that the parties would enter into a subsequent, more formal agreement."   Id. at 645 F.3d at 523.  In contrast, here, neither party has ever asserted that the Note Purchase Agreement was a preliminary agreement that would be replaced by a subsequent, more formal agreement.  To the contrary, the Note Purchase Agreement constitutes a formal, 25-page contract specifying the parties' rights and obligations in relation to Marubeni's $5 million loan to MediVas.  And, as discussed above, the Note Purchase Agreement specifically limited the ability of the parties to amend its terms by requiring compliance with paragraph 10.1.

Second, and as explained in this Court's previous orders, unlike the conflicting provisions at issue in Applied Energetics, here, the arbitration clause and venue clause are not in direct conflict.  The arbitration provision applies to disputes that may "arise

out of or in connection with" the Note Purchase Agreement. (*Note Purchase Agree.*, ¶ 10.14.)   In contrast, the venue provision is limited to "any dispute, claim or controversy between or among [the parties] concerning the interpretation or enforcement of this Agreement, or any other matter arising out of or relating to this Agreement." (*Plt's NOL*, Ex. 4 at ¶ 6.14.)   The term "Agreement" is defined as "this Security Agreement, as amended from time to time." (*Id.*, ¶ 1.3) Thus, the arbitration provision covers disputes arising out of or in connection with the 2004 Note Purchase Agreement, while the venue provision covers disputes relating to the 2007 Security Agreement.

Finally, in <u>Applied Energetics</u>, the Second Circuit's finding was supported by the Placement Agreement's merger clause because it did not incorporate the Engagement Agreement's terms and, therefore, did not incorporate the arbitration provision. <u>Id.</u> at 524 (emphasis in original).   In contrast, here, the 2007 Forbearance Agreement's merger clause specifically includes the Note Purchase Agreement:

> This Agreement, the Security Documents *and the Loan Documents* contain the entire agreement of the parties hereto and supersede any other oral or written agreement or understandings.

(*Forbearance Agree.* [Doc. 7-4], ¶ 11.b (emphasis added).)   The "Loan Documents" are defined as the 2004 Note Purchase Agreement and Promissory Note. (*Id.*, ¶ A.)   Thus, unlike <u>Applied Energetics</u>, the merger clause in the subsequent agreements confirms that the parties remain bound by the 2004 Note Purchase Agreement's unamended provisions, which as explained above includes the arbitration clause.

For all of these reasons, MediVas' arguments that are premised on the theory that the 2007 venue provision replaced or rescinded the 2004 arbitration provision lack merit.

//

//

1      **B.    MediVas has failed to identify any facts or evidence supporting the**
2            **contention that it was incapacitated.**

3      MediVas also argues that the awards should be vacated because it was
4  incapacitated.  Under Article V, section 1(a), the term "incapacity" refers to when the
5  agreement to arbitrate was made.  <u>Polytek Eng'g Co., Ltd. v. Jacobson Cos.</u>, 984 F.
6  Supp. 1238, 1242 (D. Minn. 1997) (the "challenging party must prove . . . it was under
7  an incapacity at the time the agreement was made").

8      Here, MediVas cites no facts and has provided no evidence suggesting that it was
9  under some incapacity when the 2004 Note Purchase Agreement was entered.
10 Accordingly, MediVas has failed to establish that the awards should be vacated under
11 this ground.

12

13     **C.    The record does not support MediVas' claim that it was unable to**
14           **present its case to the Arbitral Tribunal.**

15     MediVas argues that it was unable to present its case to the Arbitral Tribunal
16 because the arbitration proceeded while this Court was still considering the threshold
17 issue of arbitral jurisdiction.  MediVas, therefore, contends that it was faced with a
18 "classic Catch-22" because if it participated in the arbitration, "it would waive its
19 contractual right to trial in the San Diego Courts," but if it did not participate,
20 "Marubeni would pay the arbitrators to carry out an ex parte arbitration."  (*MediVas*
21 *Combined Opp. And P&A*, 22:7–10.)  The problem with MediVas' argument is that it
22 not only lacks evidentiary support, but the record confirms that MediVas actively
23 participated in the arbitration proceedings until the Arbitral Tribunal—like this
24 Court—ruled against MediVas on the jurisdictional issue.  Additionally, the record
25 demonstrates that MediVas never intended to present its case to Arbitral Tribunal.

26     The New York Convention has been interpreted to "essentially sanction[] the
27 application of the forum state's standards of due process. . . ."  <u>Iran Aircraft Industries</u>
28 <u>v. Avco Corp.</u>, 980 F.2d 141, 145 (2d Cir. 1992) (citation omitted).  A fundamental

requirement of due process is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" <u>Id.</u> at 146 (citation omitted).  Thus, a court may refuse to confirm an arbitration award under the New York Convention because one of the parties "was unable to present its case to the Tribunal." <u>Id.</u> at 145.

In support of its argument, MediVas suggests that it did not participate in the arbitration proceedings and, instead, "protested" that the proceedings must await this Court's resolution of the jurisdictional issue:

> MediVas vigorously protested throughout, objecting that any hearing as to the **merits** of the dispute must await this Court's decision on the threshold issue of arbitral **jurisdiction**, which remained pending before this Court from June 21, 2010, until August 2, 2011.

(*MediVas Combined Opp. And P&A*, 24:1–4 (emphasis in original.)  But the record before the Court contradicts MediVas' contention that (1) it did not participate in the arbitration proceedings and (2) it urged the Arbitral Tribunal to await this Court's decision. Instead, the record establishes that MediVas actively participated and encouraged the arbitrators to resolve the jurisdictional issue.

For example, on August 23, 2010, MediVas submitted a 9-page letter brief to the Arbitral Tribunal arguing that the venue provision governed.  (*J. Davis Dec.* [Doc. 19-2], Ex. B at 57–65.[7])  In addition, MediVas specifically stated that the arbitrators must decide the jurisdictional issue:

> We therefore assert that under the circumstances of this matter <u>the very first order of business</u> of the Tribunal clearly should be to address the merits of MediVas' objection that there is no arbitral jurisdiction over disputes between MediVas and Marubeni, and no applicable arbitration agreement governing Marubeni's claim.  This is a preliminary, foundational issue that, if decided correctly, will dispose of this spurious proceeding.  To defer the jurisdiction issue would only put the parties and the Tribunal itself to further needless delay, effort and cost.  <u>No</u>

---

[7] Marubeni did not follow the same pagination scheme throughout Exhibit B.  Some pages are referred to with a page number (i.e., 52) while other pages are numbered with an "Exhibit" number and "Page" number.

<u>alternative to immediate determination of the jurisdictional objection can be justified.</u>

(*Id.*, at 59 (emphasis in original).)   MediVas then ended the brief by urging the "Tribunal to take account of" certain expenses MediVas had incurred "in [the Tribunal's] decision or award terminating Marubeni's abusive proceeding for lack of jurisdiction." (*Id.*, at 65.)   Additionally, while asserting that it was not "participat[ing] in the instant ICC proceedings," MediVas nevertheless "invited" the Arbitral Tribunal to "address any question you may have to us." (*Id.*)

Another example is MediVas' September 17, 2010 letter brief to the tribunal. There, MediVas stated that "we see nothing in the ICC Rules suggesting that the tribunal should defer the requested ruling on MediVas' jurisdictional objection under Article 6." (*J. Davis Dec.*, Ex. B at "Exhibit 5 Page 17.")

A final example is MediVas' January 11, 2011 nine-page reply to Marubeni's letter brief. (*J. Davis Dec.*, Ex. A at 162–170.) There, MediVas concluded by stating: "Thank you once again for your attention to this matter.  On behalf of MediVas, *we look forward to receiving your ruling.*" (*Id.*, at 170 (emphasis added).)

Contrary to MediVas' argument, these letters establish that MediVas actively participated in the Arbitral Tribunal's consideration of the jurisdictional issue. Additionally, the letters contradict MediVas' suggestion that it urged the arbitrators to await this Court's resolution of the jurisdictional issue.

MediVas' argument is also not persuasive for another reason.  As Marubeni points out, this Court's Supplemental Arbitration Order was issued on August 2, 2011. At that time, the Arbitral Tribunal had not issued an award, and would not issue the Initial Award for nearly three months or the Final Award for almost six months.  Yet, despite having participated in the arbitrator's consideration of the jurisdictional issue, and despite having been told twice by this Court that the majority of its claims were subject to arbitration, MediVas did nothing after the Supplemental Arbitration Order was issued to attempt to "present its case."  For example, there is no evidence that after

August 2, 2011, MediVas requested that the Arbitral Tribunal allow additional briefing or allow MediVas an opportunity to submit evidence regarding the merits of its claims.

In fact, the record confirms that MediVas never intended to participate in the Arbitral Tribunal's consideration of the merits, regardless of this Court's rulings. In its June 9, 2010 letter to the arbitrators, MediVas reiterated its "repeated" statements that it would not submit any disputes to arbitration:

> Since our surprise receipt of notice of Marubeni's sham arbitration request, *we have repeatedly advised the ICC that our client will not submit any disputes – including any disputes over arbitration – to the ICC*, because MediVas has a binding agreement with Marubeni to submit all disputes exclusively to the San Diego Courts. Marubeni has violated and tried to evade that agreement; we will not do so.

(*J. Davis Dec.*, Ex. B at 2 (emphasis added).) Notably, there is no indication in the letter that MediVas' "repeated" statement was contingent on this Court's ruling on the jurisdictional issue.

Moreover, after receiving this Court's Supplemental Arbitration Order, MediVas sent another letter to the Arbitral Tribunal confirming that it would not participate in the arbitration and, instead, would await its opportunity to appeal the order:

> MediVas considers the remaining portions of Judge Whelan's August 2 order to be inconsistent with settled federal and state law, all of which we have previously briefed for the Tribunal. However, under federal law, an order compelling arbitration is not appealable at this time. Therefore, we will appeal Judge Whelan's decision as to MediVas' remaining claims when the August 2, order becomes appealable.

> In the meantime, we consider any and all of the Tribunal's (and Marubeni's) activities in this matter to be void and extra-legal. Under controlling federal authority, including *Polimaster, Ltd. v. RAE Systems, Inc.*, 623 F.3d 832 (9th Cir. 2010), any award the ICC renders in excess of its jurisdiction is unenforceable, and any judgment thereon will be vacated in due course. Therefore, *as previously explained on many occasions, we can not and will not participate in any way*.

(*J. Davis Dec.*, Ex. B at "Exhibit 13, page 46" (emphasis added).)  The concluding language belies MediVas' contention that it intended to participate in the arbitration.[8]

As the party challenging the Arbitral Tribunal's awards, MediVas bears the burden of establishing that it was unable to present its case to the arbitrators.  MediVas has failed to do so.  To the contrary, its letter briefs to the Arbitral Tribunal demonstrate that (1) it actively participated and encouraged the tribunal's consideration of the jurisdictional issue, and (2) had no intention of participating in the tribunal's consideration of the merits of the claims.  For these reasons, the Court finds MediVas' contention that it was unable to present its case without merit.

## IV.   CONCLUSION & ORDER

For the reasons stated above, the Court **GRANTS** Marubeni's petition to confirm the arbitration awards and **DENIES** MediVas' cross-petition to vacate.  Upon entry of the order, the Clerk of the Court shall close the District Court case file in this case, and the Consolidated Case, 11cv2852.

**IT IS SO ORDERED.**

DATE: June 4, 2014

Hon. Thomas J. Whelan
United States District Judge

___

[8] MediVas' reference to <u>Polimaster</u> is also significant.  <u>Polimaster</u> did not involve a party's inability to present its case to an arbitral tribunal, but instead held that arbitration agreements must be enforced according to the parties' intent.  <u>Id.</u>, 623 F.3d at 841.  Thus, MediVas' reference to <u>Polimaster</u> indicates that MediVas' considered the "Tribunal's (and Marubeni's) activities ... void and extra legal" because of MediVas' contention that the parties intended to rescind the arbitration clause, and not because it could not present its case to the arbitrators.